**ORAL ARGUMENT NOT YET SCHEDULED**
**NO. 16-7004**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

FRATERNAL ORDER OF POLICE, LODGE 189
LABOR COMMITTEE

Defendant-Appellant

v.

NATIONAL RAILROAD PASSENGER CORPORATION

Plaintiff-Appellee

———————————

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Case No. 1:14-cv00687-GK (Hon. Gladys Kessler)**

———————————

**BRIEF FOR APPELLANT FRATERNAL ORDER OF POLICE,**
**LODGE 189 LABOR COMMITTEE**

———————————

Thomas A. Cushane, Esquire
THE CUSHANE LAW FIRM, LLC
1028 East Landis Avenue
Vineland, New Jersey 08360
Tel: (856) 794-2050
t.cushane@cushanelawfirm.com
*Counsel for Defendant-Appellant*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

FRATERNAL ORDER OF POLICE, LODGE 189
LABOR COMMITTEE

Defendant-Appellant

v.

NATIONAL RAILROAD PASSENGER CORPORATION

Plaintiff-Appellee

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
## Case No. 1:14-cv00687-GK (Hon. Gladys Kessler)

_____

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

_____

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant Fraternal Order of Police,

Lodge 189 Labor Committee ("FOP") hereby submits this certificate as to parties,

rulings under review, and related cases:

## A.    PARTIES

### Appellant

The Appellant in this matter is Fraternal Order of Police, Lodge 189 Labor

Committee.

Appellee

The Appellee in this matter is the National Railroad Passenger Corporation (d/b/a "Amtrak").

The Court's January 19, 2016 scheduling order identifies Sarah Bryant as an Appellee in this matter; however, Ms. Bryant was removed as a defendant by way of Amtrak's July 9, 2014 Amended Complaint (District Court Dkt. No. 5).  Ms. Bryant is therefore not a party to this appeal.

The United States of America filed a Statement of Interest in the trial court proceedings below, but is also not a party to this appeal.

**B.    RULINGS UNDER REVIEW**

There are two rulings under review on appeal:

1.    The November 2, 2015 Final Order (District Court Dkt. No. 30) from the District Court for the District of Columbia in Case No. 14-cv-678 (GK) denying Appellant's motion for summary judgment and granting Appellee National Railroad Passenger Corporation's motion for summary judgment, published at Nat'l R.R. Passenger Corp. v. Fraternal Order of Police, Lodge 189, ___F.Supp. 3d___, 2015 WL 6692104 (D.D.C. Nov. 2, 2015) (Kessler, J.); and

2.    The December 30, 2015 Final Order (entered on January 4, 2016) (District Court Dkt. No. 35) from the District Court for the District of Columbia in

Case No. 14-cv-678 (GK) denying Appellant's Motion for Reconsideration, published at Nat'l R.R. Passenger Corp. v. Fraternal Order of Police, Lodge 189, 2016 WL 46713 (D.D.C. Jan. 4, 2016) (Kessler, J.).


**C.      RELATED CASES**

The case under review was not previously before this Court or any other court, and the undersigned counsel is unaware of any related cases currently pending before this Court or any other court.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. i

GLOSSARY ................................................................................. iii

STATEMENT OF JURISDICTION .......................................................1

STATUTORY PROVISIONS ..............................................................2

ISSUES PRESENTED FOR REVIEW ...................................................2

STATEMENT OF THE CASE ............................................................4

    I.     RELEVANT PROCEDURAL HISTORY ...........................................4

    II.    STATEMENT OF FACTS ........................................................5

SUMMARY OF THE ARGUMENT ....................................................10

ARGUMENT .............................................................................13

    A.    Standard of Review ............................................................13

    B.    The District Court Failed To Appropriately Recognize The Heightened Level Of Deference Afforded In Labor Arbitration Disputes ............................................................16

    C.    The District Court Erred In Failing To Recognize That It Is Congress—And Not The Parties' Collective Bargaining Agreement—Which First And Foremost Regulates Amtrak OIG's Investigatory Conduct ...................................22

    D.    The District Court Erred In Failing To Strike A Balance Between The Inspector General Act's Public Policy Goal Of Autonomy And The Railway Labor Act's Public Policy Goal Of Promoting And Ensuring Labor-Relations Stability ........................................................................26

  E. The District Court Patently Misunderstood The FOP's Argument That Amtrak's OIG And The Amtrak Police Department's Office Of Internal Affairs Perform Markedly Different Roles ................................................................27

CONCLUSION ................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page**

## Cases

Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.,
  789 F.2d 1 (D.C. Cir. 1986)................................................................ 19, 20

Andrews v. Louisville & Nashville R. Co., 406 U.S. 320 (1972) .......................... 17

Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.,
  768 F.2d 914 (7th Cir. 1985) ........................................................... 18, 21

Bhd. of Locomotive Eng'rs v. Union Pac. R.R., 719 F.3d 801 (7th Cir.
  2013)..................................................................................... 19

*CSX Transp., Inc. v. United Transp. Union, 950 F.2d 872 (2d Cir.
  1991)................................................................................. 18, 21

Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,
  396 U.S. 142 (1969) .................................................................... 16

Diamond v. Terminal Ry. Alabama State Docks, 421 F.2d 228
  (5th Cir. 1970) ..................................................................... 14, 18

E. Assoc. Coal Mine v. Mine Workers Dist. 17, 531 U.S. 57 (2000) ................... 15

Gunther v. San Diego & Arizona E. Ry., 382 U.S. 257 (1965) ...................... 13, 17

Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.,
  790 F.2d 139 (2d Cir. 1986) ........................................................... 17

J. & E. Ry. Co. v. Burley, 325 U.S. 711 (1945) ..................................... 16

Loveless v. E. Air Lines, Inc., 681 F.2d 1272 (11th Cir. 1982) ...................... 18

Lyons v. Norfolk & W. Ry., 163 F.3d 466 (7th Cir. 1999)........................... 15, 19

Major League Baseball Player's Ass'n v. Garvey, 532 U.S. 504 (2001).............. 16

Morton v. Mancari, 417 U.S. 535 (1974) ............................................ 26

Authorities upon which we chiefly rely are marked with asterisks                i

NASA v. Fed. Labor Relations Auth., 527 U.S. 229 (1999) .................... 9

Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union, 589
 F.3d 437 (D.C. Cir. 2009) ............................................................ 16

*Nw. Airlines v. Air Line Pilots Ass'n, 808 F.2d 76 (D.C. Cir. 1987)...... 11, 15, 19

Traynor v. Turnage, 485 U.S. 535 (1988) ............................................ 26

*Union Pac. R.R. v. Sheehan, 439 U.S. 89 (1978).................................. 13, 14, 17

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.,
 363 U.S. 593 (1960) .................................................................. 11, 19

United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805
 (2d Cir. 2009) ........................................................................... 21

**Statutes**

45 U.S.C. § 151(a) ............................................................................ 16, 17

45 U.S.C. § 153 First (q) ................................................................... 14, 17

5 U.S.C. App. 3 § 11(a)(2)(B) ........................................................... 23

5 U.S.C. App. 3 § 11(b)(1)(A) ........................................................... 23

5 U.S.C. App. 3 § 11(d)(7)(A) ........................................................... 23

5 U.S.C. App. 3 § 8G(a)(1)(B) ........................................................... 23

5 U.S.C. App. 3 § 8G(a)(2)................................................................. 23

**Treatises**

Chris A. Hollinger, THE RAILWAY LABOR ACT (3rd Ed. 2012) ............. 18

## <u>GLOSSARY</u>

**APD:**          **Amtrak Police Department**

**APD-OIA:**  **Amtrak Police Department Office of Internal Affairs**

**APD IA:**     **Amtrak Police Department Internal Affairs**

**CIGIE:**      **Council of the Inspectors General on Integrity and Efficiency**

**FOP:**          **Fraternal Order of Police**

**IGA:**          **Inspector General Act**

**OIG:**          **Office of the Inspector General**

**QSI:**          **Quality Standards for Investigation**

**RLA:**          **Railway Labor Act**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

FRATERNAL ORDER OF POLICE, LODGE 189
LABOR COMMITTEE

Defendant-Appellant

v.

NATIONAL RAILROAD PASSENGER CORPORATION

Plaintiff-Appellee

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Case No. 1:14-cv00687-GK (Hon. Gladys Kessler)

_____

## BRIEF FOR APPELLANT FRATERNAL ORDER OF POLICE,
## LODGE 189 LABOR COMMITTEE

_____

## STATEMENT OF JURISDICTION

This is an appeal from: (1) the District Court's November 2, 2015 Final

Order (District Court Dkt. No. 30) denying Appellant's motion for summary

judgment and granting Appellee National Railroad Passenger Corporation's

motion for summary judgment; and (2) the District Court's December 30, 2015

Final Order (entered on January 4, 2016) (District Court Dkt. No. 35) denying

Appellant's motion for reconsideration.  Appellant filed a timely notice of appeal

on January 4, 2016.  (District Court Dkt. No. 37).

1

This Court's jurisdiction over the appeal from the district court's final orders noted above rests on 28 U.S.C. § 1291.

## STATUTORY PROVISIONS

The pertinent portions of the Railway Labor Act, 45 U.S.C. § 151 et seq., and the Inspector General Act, 5 U.S.C. App. 3 § 1, et seq. can be found in the addendum to this brief.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in relying upon this Court's decision in U.S. Dep't of Homeland Sec. v. Fed. Labor Relations Auth., 751 F.3d 665 (D.C. Cir. 2014)—a case decided three months *after* the arbitrator's decision in the underlying matter—rather than the United States Supreme Court's watershed decision in NASA v. Fed. Labor Relations Auth., 527 U.S. 229 (1999) to determine that procedural limitations on the conduct of internal investigations contained in a collective bargaining agreement between the National Railroad Passenger Corporation ("Amtrak") and the FOP are not binding on Amtrak's Office of Inspector General.

2.      Whether the District Court subsequently erred in ignoring the statutory restrictions that Congress—and not Amtrak or the FOP—placed on

2

Amtrak's Office of Inspector General when Congress created the Council of the Inspectors General on Integrity and Efficiency ("CIGIE") by way of the Inspector General Reform Act of 2008.

3.     Whether the district court erred in failing to recognize that Rule 50 of the parties' collective bargaining agreement imposes no further restrictions upon the independence of Amtrak's Office of Inspector General to conduct investigations than those restrictions set forth by the CIGIE in the Quality Standards for Investigation ("QSI") the CIGIE promulgates—standards by which Amtrak's Office of Inspector General was statutorily bound to abide as a member of the CIGIE and standards to which Amtrak's board of directors explicitly referred in its November 1, 2011 memorandum addressing the responsibility and authority of Amtrak's OIG.

4.     Whether the district court erred in declining to entertain the FOP's argument that Amtrak's inspector general is not Amtrak's prosecutorial arm in Amtrak's personnel matters, and that while Amtrak may certainly welcome and accept a full investigative report containing findings and recommendations from Amtrak's inspector general, Amtrak may not rely solely upon the fruits of its OIG's investigation in meting out discipline to Amtrak's employees—especially without first having itself afforded the due process protections set forth in Rule 50 of the parties' collective bargaining agreement.

3

## STATEMENT OF THE CASE

### I.     RELEVANT PROCEDURAL HISTORY

Following a disciplinary conference held on December 3, 2012, Amtrak police officer (and FOP Lodge 189 member) Sarah Bryant was terminated from her position with the Amtrak Police Department.  (District Court Dkt. No. 22-1, p.8).[1]  Ofc. Bryant appealed her termination to the Special Board of Adjustment in accordance with the parties' collective bargaining agreement and an arbitration hearing was conducted on November 13, 2013.  (District Court Dkt. No. 22-1, p.1).

By way of a March 24, 2014 decision and award, Arbitrator Parker ruled that Amtrak's Office of Inspector General failed to afford Ofc. Bryant certain due-process protections set forth in Rule 50 of the parties' collective bargaining agreement prior to Bryant's termination and, as a result, ordered Bryant's reinstatement to the Amtrak Police Department and the restoration of Ofc. Bryant's seniority with back pay and benefits.  (District Court Dkt. No. 22-1, p.22).

On April 22, 2014, National Railroad Passenger Corporation ("Amtrak") filed a complaint in the District Court for the District of Columbia seeking to vacate the arbitration award.  (District Court Dkt. No. 1).  The FOP filed its answer to Amtrak's complaint on September 26, 2014.  (District Court Dkt. No. 9).

---

[1] Pinpoint citations contained herein that pertain to the record below will be to the page number enumerated on the top right-hand side of the document that was generated by the District Court upon filing.

4

Amtrak thereafter moved for summary judgment on July 10, 2015, (District Court Dkt. No. 23), prompting the FOP to cross-move for summary judgment on August 14, 2015.  (District Court Dkt. No. 25).

The district court issued an Order on November 2, 2015: (1) granting Amtrak's motion for summary judgment; (2) denying the FOP's cross-motion for summary judgment; and (3) ordering that the March 24, 2014 arbitration award be vacated.  (District Court Dkt. No. 30, pp.2-3).

The FOP moved for reconsideration in the district court on November 25, 2015 (District Court Dkt. No. 32), but by way of an Order dated December 30, 2015, the district court denied the FOP's motion.  (District Court Dkt. No. 35, p.3).

This appeal followed.  (District Court Dkt. No. 37).

## II.     STATEMENT OF FACTS

The arbitration award under review in this matter was rendered pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 153, and the most recent collective bargaining agreement between Amtrak and the FOP (effective June 10, 2010).  (District Court Dkt. No. 22-2, pp.62-123).  The collective bargaining agreement provides, among other things, that discipline of Amtrak Police Department ("APD") employees is governed by Rule 34 of that agreement (District Court Dkt. No. 22-2, pp.94-96), and that employees who are dissatisfied with the results of

5

internal disciplinary appeals are entitled to submit an appeal to the Special Board of Adjustment under Section 3, Second, of the RLA.  (District Court Dkt. No. 22-2, pp.95-96).

One such employee, Amtrak police officer and FOP member Sarah Bryant, came under investigation by both Amtrak Police Department's Office of Internal Affairs ("APD-OIA") and Amtrak's Office of Inspector General ("OIG") upon allegations that she improperly benefited in the form of "surge" overtime as a result of an alleged romantic relationship with one of her supervisors.  (District Court Dkt. No. 22-1, pp.4-5; District Court Dkt. No. 22-3, pp.136-41).  While the APD-OIA ultimately did not sustain any of the alleged charges against Ofc. Bryant, the OIG's investigation continued.  (District Court Dkt. No. 22-1, p 5).

At the outset of Ofc. Bryant's OIG interview she was given a Garrity-like warning by OIG investigators and was told that she had the right to remain silent and that anything she said could and would be used against her—rights which Ofc. Bryant waived.  (District Court Dkt. No. 22-1, p. 5; District Court Dkt. No. 22-3, p.113).  Ofc. Bryant was not advised at that time, however, of her right to union representation, nor was she given Miranda warnings.  (District Court Dkt. No. 22-1, p.5).  Her interview was also not recorded.  (District Court Dkt. No. 22-1, p.5).

Rule 50 of the parties' collective bargaining agreement (entitled "Police Officer Bill of Rights") expressly provides for such protections:

*********

(2)  The employee shall be advised of his right to an adjournment in order to have the Organization's counsel (or his designee) and/or Organization representative present.

*********

(4)  If the employee is under arrest or is likely to be, that is, if he is the suspect or target of a criminal investigation, he shall be given his rights pursuant to the <u>Miranda</u> direction.

*********

(7)  The complete interrogation of the employee shall be recorded mechanically or by a stenographer.  All recesses called during the questioning shall be noted.  The employee or the Organization's counsel (or his designee) shall be entitled to a transcript of such stenographic record within a reasonable time after such interrogation.

(District Court Dkt. No. 22-1, pp.102-03).

Despite failing to afford Ofc. Bryant the foregoing protections, then-Acting Chief of Police Lisa Shahade issued administrative charges against Ofc. Bryant on November 19, 2012.  (District Court Dkt. No. 22-1, p.7); (District Court Dkt. No. 22-3, pp.63-64).   Ofc. Bryant declined Amtrak's offer to resign in lieu of termination, and was terminated shortly thereafter.  (District Court Dkt. No. 22-1, p.8); (District Court Dkt. No. 22-3, p.68).  Ofc. Bryant appealed her termination in accordance with the parties' negotiated grievance procedure and her appeal was

presented to the Special Board of Adjustment for review on November 13, 2013. (District Court Dkt. No. 22-1, p.2).  The relevant issue (as stipulated by the parties) before mutually selected arbitrator Joan Parker was as follows:

> *Did the Corporation have just cause to terminate Grievant Sarah Bryant?  If not, what shall be the remedy?*

(District Court Dkt. No. 22-1, p.3).

Amtrak argued at arbitration that its OIG is not a signatory to the collective bargaining agreement and that its OIG is therefore not bound by Rule 50's procedural safeguards.  (District Court Dkt. No. 22-1, pp.12-13).  In response, the FOP argued that while Amtrak's OIG may not have directly entered into the parties' collective bargaining agreement, Amtrak (the corporation) comprises not only the APD but the entire complement of Amtrak entities, including Amtrak's OIG.  (District Court Dkt. No. 22-1, p.14).  The FOP further argued that Amtrak's OIG acts as an arm of the corporation and must therefore comply with the procedural protections for employees negotiated with the Corporation.  (District Court Dkt. No. 22-1, pp.14-15).

In support of its position, the FOP cited NASA v. Fed. Labor Relations Auth., 527 U.S. 229 (1999) for the proposition that "an OIG's investigative office, as contemplated by the [Inspector General Act] is performed with regard to, *and on behalf of*, the particular agency in which it is situated," and that "investigators

employed in [an] OIG are unquestionably 'representatives' of [the agency] when acting within the scope of their employment." (District Court Dkt. No. 22-1, p.15) (quoting <u>NASA v. Fed. Labor Relations Auth.</u>, 527 U.S. 229, 240 (1999)) (emphasis added).

After considering the parties' arguments and submissions, Arbitrator Parker rendered her decision and award on March 24, 2014. (District Court Dkt. No. 22-1, pp.1-21). Abitrator Parker first opined that "Amtrak OIG is a part of the overall Corporation that entered into the Collective Bargaining Agreement with the Union," reasoning that "the rights in question" were "contractual protections voluntarily negotiated and agreed to by the Corporation, and accordingly adopted into the Collective Bargaining Agreement." (District Court Dkt. No. 22-1, p.20). Against that backdrop, Arbitrator Parker concluded that "[t]he due process rights established by Rule 50 were unambiguously intended to govern all bargaining unit[-]member interrogations, whether performed by APD IA or Amtrak OIG." (District Court Dkt. No. 22-1, p.21).

Following <u>NASA</u>'s lead, Arbitrator Parker sensibly ruled that Amtrak OIG's failure to afford Ofc. Bryant the protections set forth in Rule 50 was "procedurally deficient" and that Amtrak's subsequent discipline of Ofc. Bryant "[could not] be sustained." (District Court Dkt. No. 22-1, pp.21-22). She accordingly ordered Bryant's reinstatement and restoration of seniority with back pay and benefits. <u>Id.</u>

Amtrak filed suit in the district court on April 22, 2014, seeking vacatur of the arbitration award under the RLA. (District Court Dkt. No. 1). The FOP filed its answer to Amtrak's complaint on September 26, 2014. (District Court Dkt. No. 9). Amtrak filed for summary judgment on July 10, 2015 (District Court Dkt. No. 23), which was followed on August 15, 2015 by the FOP's cross-motion for summary judgment. (District Court Dkt. No. 25).

The district court issued an Order on November 2, 2015 granting Amtrak's motion for summary judgment, denying the FOP's cross-motion for summary judgment, and ordering that the arbitrator's March 24, 2014 decision and award be vacated. (District Court Dkt. No. 30, pp.2-3).

The FOP filed a motion for reconsideration on November 25, 2015. (District Court Dkt. No. 32), but by way of an Order dated December 30, 2015, the district court denied the FOP's motion. (District Court Dkt. No. 35, p.3).

## SUMMARY OF THE ARGUMENT

At its core, this case is nothing more than a dissatisfied employer's attempt to obtain a *post hoc* reversal of a mutually selected arbitrator's well-reasoned binding arbitration award—an award which, contrary to the district court's improper holding below, was entirely consistent with controlling legal precedent and which properly drew its essence directly from the plain language of the parties'

10

collective bargaining agreement.  In doing so, the district court vastly exceeded its authority under a standard of review that is considered among the narrowest known to the law.

The district court first erred in failing to recognize that the arbitrator appropriately consulted the Inspector General Act ("IGA") and the United States Supreme Court's treatment of that Act in <u>NASA v. Fed. Labor Relations Auth.</u>, 527 U.S. 229 (1999) ("<u>NASA</u>") for guidance in rendering her decision—a practice strongly encouraged by the United States Supreme Court, provided the award still draws its essence from the collective bargaining agreement.  <u>See, e.g.</u>, <u>United Steelworkers of Am. v. Enter. Wheel & Car Corp.</u>, 363 U.S. 593, 597 (1960). Moreover, the district court failed to appreciate that, as with the narrow statutory grounds for reviewing an arbitration award, the public policy basis for judicial review of a binding arbitration award is also "extremely limited" and only emanates from "clear statutory or case law, not from general considerations of supposed public interests."  <u>Nw. Airlines v. Air Line Pilots Ass'n</u>, 808 F.2d 76, 83 (D.C. Cir. 1987).  But, of course, the legal principles upon which Amtrak relied in support of its public-policy argument were anything but "longstanding" and "firmly engrained" (as Amtrak suggested) because, quite simply, <u>U.S. Dep't of Homeland Security v. Fed. Labor Relations Auth.</u>, 25 F.3d 665 (D.C. Cir. 2014) *had not yet been decided* at the time the arbitrator issued her award.

11

Notwithstanding the foregoing, the district court also erred by summarily discounting the FOP's argument concerning the statutory restrictions that Congress (and not Amtrak or the FOP) placed on Amtrak's inspector general when Congress created the Council of the Inspectors General on Integrity and Efficiency ("CIGIE"). Indeed, the district court devoted no substantive analysis whatsoever to the Quality Standards for Investigation ("QSI") that the CIGIE promulgates— standards by which Amtrak's OIG was and is statutorily bound to abide as a member of the CIGIE and standards to which Amtrak's board of directors explicitly referred in a November 1, 2011 memorandum addressing the responsibility and authority its OIG.

In that same regard, the district court also failed to perform any substantive analysis whatsoever of the interplay between the statutory independence afforded to inspectors general under the Inspector General Act ("IGA") and the equal—if not superior—statutory importance of free and uninhibited labor relations promoted by the Railway Labor Act ("RLA"). The district court instead summarily posited that negotiations as a whole are antithetical to OIG independence before offering a blanket statement that "the principle of Inspector General independence underlying the IG Act prevails over the collective bargaining rights established by the federal labor relations statutes."

Finally, the district court wholly misunderstood—and, for that matter, refused to address—the FOP's argument concerning the relationship between Amtrak's OIG and Amtrak's dedicated internal affairs bureau.  Had the district court properly considered the FOP's contentions, it would have recognized that its decision to vacate Arbitrator Parker's March 24, 2014 decision and award amounted to a tacit endorsement of Amtrak's calculated effort to perform an end-run around the due-process protections that unmistakably govern APD OIA investigations and to instead rely solely upon the poisoned fruits of Amtrak OIG investigations in meting out discipline to its employees.

For these reasons, the district court's November 2, 2015 Memorandum and Order and its December 30, 2015 Memorandum and Order must be reversed.


## ARGUMENT

### A.    Standard of Review

The scope of judicial review of arbitration awards under the Railway Labor Act has been characterized by the United States Supreme Court as being "among the narrowest known to the law."  Union Pac. R.R. v. Sheehan, 439 U.S. 89, 94 (1978).  Indeed, courts are limited to reviewing awards under standards that clearly favor the exclusiveness of an Adjustment Board's jurisdiction and the finality of awards.  See Gunther v. San Diego & Arizona E. Ry., 382 U.S. 257, 263-64 (1965)

13

(holding that "Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board").  This stated desire for finality is deeply rooted in Congress' intent in enacting the RLA, whereby Congress:

> [E]ndeavored to promote stability in labor-management relations . . . by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements.

Sheehan, 439 U.S. at 94.

Given the strong presumption of validity of arbitration awards issued under the RLA, judicial review of such awards is therefore only permitted based upon three narrow grounds: (1) the failure of an Adjustment Board "to comply with the requirements" of the RLA; (2) the failure of an Adjustment Board "to conform, or confine itself, to matters within the scope of [its] jurisdiction; or (3) "fraud or corruption" by an Adjustment Board member.  45 U.S.C. § 153 First (q).

Claims that an Adjustment Board failed to act within its jurisdiction under the second of the three grounds enumerated above have generally been rejected by our nation's courts as impermissible attempts to substitute a court's interpretation of a collective bargaining agreement for that of the Board.  See, e.g., Diamond v. Terminal Ry. Alabama State Docks, 421 F.2d 228, 233 (5th Cir. 1970) (holding that "[t]he federal courts do not sit as super[-]arbitration tribunals in suits brought to enforce awards of the Adjustment Boards").  The overwhelming judicial

14

consensus—including within this Circuit—is that unless the award fails altogether to "draw[] its essence from the collective bargaining agreement," its author is acting within the scope of his or her jurisdiction.  Nw. Airlines v. Air Line Pilots Ass'n, 808 F.2d 76, 80 (D.C. Cir. 1987).  As the Seventh Circuit observed:

> [T]he question for a federal court asked to set aside an arbitration award . . . is not whether the arbitrator[s] erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they *interpreted* the contract.  If they did, their interpretation is conclusive.

Lyons v. Norfolk & W. Ry., 163 F.3d 466, 470 (7th Cir. 1999) (emphasis added).

In addition to the three limited statutory grounds for judicial review of labor arbitration awards under the RLA, some courts have considered—but have rarely upheld—public policy challenges to such awards, generally holding instead that the public-policy basis for review is also "extremely narrow" and must emanate from "clear statutory or case law, not [merely] from general considerations of supposed public interest."  Nw. Airlines, 808 F.2d at 83.  Indeed, a party seeking vacatur of a binding arbitration award is tasked with identifying an "explicit, well-defined, and dominant public policy" that is offended by the arbitrator's interpretation of a collective bargaining agreement to warrant judicial intervention.  E. Assoc. Coal Mine v. Mine Workers Dist. 17, 531 U.S. 57, 67 (2000).

15

In short, the inquiry is *not* "whether the arbitrator erred—or even seriously erred—in interpreting the contract," <u>Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union</u>, 589 F.3d 437, 441 (D.C. Cir. 2009), but rather whether the arbitrator was "even arguably construing or applying the contract." <u>Major League Baseball Player's Ass'n v. Garvey</u>, 532 U.S. 504, 509 (2001) (internal citations omitted). As this Court has observed, "[t]his extraordinarily deferential standard is essential to preserve the efficiency and finality of the labor arbitration process." <u>Nat'l Postal Mail Handlers Union</u>, 589 F.3d at 441.

### B.    The District Court Failed To Appropriately Recognize The Heightened Level Of Deference Afforded In Labor Arbitration Disputes

The Railway Labor Act "(RLA"), 45 <u>U.S.C.</u> § 151 <u>et seq.</u>, was enacted in 1926 to provide for the prompt and orderly settlement of labor disputes between railway carriers and their employees. <u>See</u> 45 <u>U.S.C.</u> § 151(a); <u>see also</u> <u>Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union</u>, 396 U.S. 142 (1969). To effectuate this purpose, the RLA imposes distinct dispute-resolution procedures for what the United States Supreme Court has labeled "minor" and "major" disputes. <u>J. & E. Ry. Co. v. Burley</u>, 325 U.S. 711, 723-25 (1945). For "major" disputes, the RLA requires "voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation," <u>id.</u> at 725, whereas for "minor" disputes, labor-management

16

adjustment boards—created pursuant to 45 U.S.C. § 18—are granted exclusive jurisdiction.  Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc., 790 F.2d 139, 141 (2d Cir. 1986).

"Minor" disputes generally involve—as here—controversies over the "*interpretation or application* of agreements covering rates of pay, rules, working conditions," 45 U.S.C. §151(a) (emphasis added), as well as any disciplinary disputes, including those involving employee discharge.  See Andrews v. Louisville & Nashville R. Co., 406 U.S. 320, 322 (1972).

The Supreme Court "time and again has emphasized and re-emphasized that Congress intended minor grievances of railroad workers to be decided *finally* by the Railroad Adjustment Board."  Gunther, 382 U.S. at 263 (emphasis added); see also Sheehan, 439 U.S. at 99 ("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts."). Hence, the very limited circumstances under which a court is permitted to review an arbitration award under the RLA are:

> (1) failure of an Adjustment Board "to comply with the requirements" of the RLA; (2) failure of an Adjustment Board "to conform, or confine itself, to matters within the scope of [its] jurisdiction; and (3) "fraud or corruption" by an Adjustment Board member.

45 U.S.C. § 153 First (q).

The only statutorily recognized basis cited by Amtrak in its complaint on which it believed the district court could review the arbitrator's March 24, 2014 award is the second of the three: that the award exceeds the proper scope of jurisdiction under the RLA. Not only is this the most often-cited basis for challenging an RLA award, see Chris A. Hollinger, THE RAILWAY LABOR ACT 497 (3rd Ed. 2012), it is also typically rejected as an impermissible attempt to substitute the court's interpretation of the collective bargaining agreement for that of the Special Board of Adjustment. See, e.g., Diamond, 421 F.2d at 233 (holding that "federal courts do not sit as super[-]arbitration tribunals in suits brought to enforce awards of the Adjustment Boards."). Thus, "[w]here fraud is not an issue, [reviewing courts] ask only whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." CSX Transp., Inc. v. United Transp. Union, 950 F.2d 872, 877 (2d Cir. 1991) (quoting Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co., 768 F.2d 914, 921 (7th Cir. 1985)) (internal quotation marks and alterations omitted); see also Loveless v. E. Air Lines, Inc., 681 F.2d 1272, 1276 (11th Cir. 1982) ("It is thus firmly established that courts will not review the substance of a labor arbitration award for ordinary error and that courts will not vacate an award because a judge might have reached a different result.").

Arbitrators can only be said to have exceeded their jurisdiction "if they fail to interpret the collective bargaining agreements between the parties," not "if they make a mistake in interpreting a collective bargaining agreement."  Bhd. of Locomotive Eng'rs v. Union Pac. R.R., 719 F.3d 801, 803 (7th Cir. 2013) (citing Lyons, 163 F.3d at 469).

Each of the foregoing principles—but a tiny sample of how federal courts throughout the country treat the issue of judicial review of binding arbitration awards—is in direct harmony with the decisions of this Circuit, in that "so long as the arbitrator's decision 'draws its essence from the collective bargaining agreement,' it must be enforced."  Nw. Airlines, 808 F.2d at 83 (quoting United Steelworkers, 363 U.S. at 597).  Of course, arbitrators do not interpret and apply contract terms in a vacuum and, as the Seventh Circuit Court of Appeals noted in Bhd. of Locomotive Eng'rs, they are permitted—if not encouraged—to "look for guidance from many sources" in reaching their results.  Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 789 F.2d 1, 5 (D.C. Cir. 1986) (citing United Steelworkers, 363 U.S. at 597).

Indeed, that is precisely what Arbitrator Parker did before voiding Sarah Bryant's termination and ordering her reinstatement, a fact that was entirely lost on the district court below.  The "essence" of Arbitrator Parker's award is that Amtrak employees are entitled to the contractual protections for which they collectively

bargained via Rule 50 of the parties' collective bargaining agreement, irrespective of the OIG's involvement in the investigative process. That conclusion was preceded by—indeed, *necessitated* by—Amtrak's defense at arbitration that its OIG is not bound by the due-process protections that comprise Rule 50. It was therefore not only prudent, but imperative, that Arbitrator Parker analyze whether Amtrak's OIG and Amtrak (the Corporation) were one and the same with respect to the applicability of the language set forth in Rule 50 of the parties' collective bargaining agreement. This analysis was plainly necessary because, as Arbitrator Parker keenly observed, "Rule 50 does not [expressly] exempt Amtrak OIG" from affording the protections it enumerates. (District Court Dkt. No. 22-1, p.20).

Heeding the United States Supreme Court's guidance in United Steelworkers, Arbitrator Parker wisely consulted the Inspector General Act, the Supreme Court's analysis in NASA (which, at the time of her award, was the sole legal precedent on the issue), and Amtrak's prior policies for guidance. It therefore cannot be said—as the district court in this case has suggested—that Arbitrator Parker "fail[ed] to interpret [the] agreement [by] ignoring the text of the agreement" and that she "rel[ied] on [her] own notions of justice." United Steelworkers, 363 U.S. at 597; see also Am. Postal Workers Union, 789 F.2d at 8.

To the contrary, the arbitrator logically reasoned that "the due process rights established by Rule 50 were unambiguously intended to govern all bargaining

unit[-]member interrogations, whether performed by APD [O]IA or Amtrak OIG."
(District Court Dkt. No. 22-1, p.20). This was a patently dutiful—to say nothing of
utterly correct—interpretation of the parties' collective bargaining agreement and
application of controlling legal precedent.

Notwithstanding the foregoing, the district court did that which it plainly
could not: *substitute its judgment for that of the arbitrator*. It was not within the
province of the district court—or any other court, for that matter—to judge
whether the arbitrator's decision was right or wrong and whether a better decision
could have or should have been made. Indeed, the only question for the district
court to decide was "whether the arbitrator[] did the job [she was] told to do—not
whether [she] did it well, or correctly, or reasonably, but simply whether [she] did
it." CSX Transp., 950 F.2d at 877 (quoting Bhd. of Locomotive Eng'rs., 768 F.2d
at 921) (internal quotation marks and alterations omitted). As Amtrak itself
ironically—but rightly—argued in its brief before the Second Circuit Court of
Appeals in United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805 (2d
Cir. 2009), "that is the end of the inquiry under the RLA." Defendant's
Memorandum of Law in Support of Summary Judgment at 10, United Transp.
Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805 (2d Cir. 2009) (No. 06-CV-
0503).

21

The district court, accordingly, had no legitimate alternative but to confirm Arbitrator Parker's well-reasoned award.

### C. The District Court Erred In Failing To Recognize That It Is Congress—And Not The Parties' Collective Bargaining Agreement—Which First And Foremost Regulates Amtrak OIG's Investigatory Conduct

Throughout its November 2, 2015 Memorandum Opinion, the district court posits that the Inspector General Act, codified at 5 U.S.C. App. 3 § 1, et seq., promotes an explicit, well-defined, and dominant public policy that purports to prohibit an OIG's investigative powers from being regulated or abridged by the terms and conditions of a collective bargaining agreement. (District Court Dkt. No. 31, pp.14, 15, 17, 20). It is upon this logic that the district court nullified the arbitrator's March 24, 2014 Opinion and Award, noting that enforcing that award would ostensibly allow Rule 50 of the parties' collective bargaining agreement to unlawfully regulate Amtrak OIG's conduct during employee interviews. (District Court Dkt. No. 31, p.20). That holding, however, in and of itself represents a clear error of law, as it is in fact Congress—and not the parties' collective bargaining agreement—which regulates Amtrak OIG's investigatory conduct.

The district court devoted a great deal of its Memorandum Opinion to the Inspector General Reform Act of 2008's goal of enhancing the independence of our nation's inspectors general. (District Court Dkt. No. 31, pp.8, 9, 14, 17, 18,

20). And yet the district court failed to make even a passing reference to the second—but no less important—stated purpose of that very Act: to create "an independent entity within the executive branch" which will be tasked with "increas[ing] the professionalism and effectiveness of personnel by developing *policies, standards, and approaches* to aid in the establishment of a well-trained and highly skilled workforce in the offices of the Inspectors General." 5 U.S.C. App. 3 § 11(a)(2)(B) (emphasis added). That entity—the Council of the Inspectors General on Integrity and Efficiency ("CIGIE")—is made up of any and all inspectors general whose offices are established under either Section 2 or Section 8G of the Inspector General Act. 5 U.S.C. App. 3 § 11(b)(1)(A). Amtrak simply cannot deny—and, in fact, has not denied—that its OIG is a CIGIE member. 5 U.S.C. App. 3 § 8G(a)(1)(B), -(a)(2).

As a member of the CIGIE, Amtrak's OIG is therefore statutorily bound to "adhere to the professional standards developed by the Council," known formally as the Quality Standards for Investigations ("QSI"). 5 U.S.C. App. 3 § 11(c)(2); 5 U.S.C. App. 3 § 11(d)(7)(A). To be sure, the Inspector General Reform Act of 2008 itself mandates that "investigations initiated under this subsection *shall* be conducted in accordance with the most current Quality Standards for Investigations issued by the Council . . . ." 5 U.S.C. App. 3 § 11(d)(7)(A) (emphasis added). The district court's claim in its December 30, 2015 Memorandum Opinion that "the

23

QSIs are not established by Congress" (District Court Dkt. No. 36, p.9, n.2) is therefore simply untrue—as Congress plainly delegated the authority to develop such standards to the CIGIE.

Had the district court performed even a cursory review of those standards within its Memorandum Opinion, it would have been hard-pressed to deny that the CIGIE imposes almost identical restrictions upon its OIG members in conducting their respective investigations as those set forth in Rule 50 of collective bargaining agreement between Amtrak and the FOP.[2]  For example, the QSI directs its members to consult the United States Supreme Court's decisions in both NLRB v. Weingarten, 420 U.S. 251 (1975) and Miranda v. Arizona, 384 U.S. 436 (1966) to glean the types of "appropriate warnings" that must be afforded to any individuals suspected of violating law or regulations prior to the conduct of an OIG

---

[2] The district court readily acknowledges in its December 30, 2015 Memorandum Opinion denying the FOP's motion for reconsideration that it "did not discuss the intricacies of the QSIs or the CIGIE or any other pre-existing restrictions on the OIG's authority," (District Court Dkt. No. 36, p.8), concluding instead that "no discussion is necessary" because this Court ruled in DHS that "negotiation in and of itself is antithetical to OIG independence established by the Inspector General Act."  (District Court Dkt. No. 36, pp.8-9) (citing U.S. Dep't of Homeland Sec. v. Fed. Labor Relations Auth., 751 F.3d 665, 672 (D.C. Cir. 2014)).  The district court misapprehends the thrust of the FOP's argument regarding the QSI and CIGIE, however, in that even if the FOP accepts as true the fact that "negotiation in and of itself is antithetical to OIG independence" and that the constraints set forth in Rule 50 of the parties' collective bargaining agreement are—for the sake of argument—therefore inapplicable, Amtrak's OIG is still nevertheless statutorily obligated to afford the very same due-process protections guaranteed under Rule 50 by way of the QSI.  The end result is the same.

investigation—the very same warnings guaranteed under the second and fourth paragraphs, respectively, of Rule 50. (District Court Dkt. No. 22-2, pp.102-03).

The QSI also mandates that OIG investigations "be initiated, conducted, and reported in accordance with (a) all applicable laws, rules and regulations; (b) guidelines from the Department of Justice and other prosecuting authorities; and (c) *internal agency policies and procedures*." (District Court Dkt. No. 24-1, p.18); (District Court Dkt. No. 25-3, p.18) (emphasis added). On its face, the QSI entirely substantiates the FOP's argument that Amtrak's OIG is obligated to consider the provisions set forth at Rule 50 of the parties' collective bargaining agreement—a set of collectively negotiated written *procedures* designed to govern the conduct and control of all investigations.

For these reasons, it was incumbent upon the district court to conclude that it is ultimately *Congress* which has mandated that certain protections be afforded to individuals subject to the investigatory power of Amtrak's OIG prior to the conduct of the OIG's investigation, and not the parties themselves *solely* by way of their collective bargaining agreement. In light of that congressional mandate, the district court erred in failing to recognize that the arbitrator's March 24, 2014 Opinion and Award imposes no more restrictions upon the investigatory independence of Amtrak's OIG than those already imposed by Congress.

**D.    The District Court Erred In Failing To Strike A Balance Between The Inspector General Act's Public Policy Goal Of Autonomy And The Railway Labor Act's Public Policy Goal Of Promoting And Ensuring Labor-Relations Stability**

Given that Amtrak OIG's investigative independence is inarguably restricted first and foremost by Congress itself—and not, as the district court improvidently concluded, exclusively by the terms and conditions of Rule 50 of the parties' collective bargaining agreement—the district court erred in neglecting to perform any substantive analysis of the interplay between the statutory independence guaranteed to inspectors general under the IGA and the equal if not superior statutory goal of free and uninhibited labor negotiations promoted by the RLA.

In situations where, as here, there are two statutes deserving of a court's consideration, courts are generally "not at liberty to pick and choose among congressional enactments." Traynor v. Turnage, 485 U.S. 535, 548 (1988). As the United States Supreme Court has observed, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Id. (citing Morton v. Mancari, 417 U.S. 535, 551 (1974)).

But in direct contravention of the Supreme Court's holding in Traynor, the district court failed to give any effect to—let alone perform any analysis of—the RLA provisions cited by the FOP to the district court. Instead, the district court once again hid behind the purported "shield" of DHS on grounds that "negotiation

26

itself is . . . not allowed." (District Court Dkt. No. 36, p.10). On that basis alone, the district court summarily concluded that "the principle of Inspector General independence underlying the IG Act prevails over the collective bargaining rights established by the federal labor relations statutes." (District Court Dkt. No. 36, p.11).

Without more, the FOP—as well as Congress, the public at large, the inspectors general themselves, and all other federal labor unions subject to the investigatory powers of their respective inspectors general—are left with little or no guidance as to the relationship between two equally important statutes that can, at least on their face, otherwise meaningfully coexist in the context of a single case. The district court inarguably owes more than mere summary conclusions on this vital issue, especially given that Rule 50 of the parties' collective bargaining agreement imposes no further restrictions upon the independence of Amtrak's inspector general to conduct investigations than those set forth in the QSI.

### E.   The District Court Patently Misunderstood The FOP's Argument That Amtrak's OIG And The Amtrak Police Department's Office Of Internal Affairs Perform Markedly Different Roles

Lastly, the district court fundamentally misapprehends the FOP's argument concerning the relationship between the Amtrak Police Department's Office of Internal Affairs ("APD OIA") and Amtrak's inspector general. For even if the

FOP were to concede that an inspector general's independence cannot be restrained or abridged by the terms and conditions of a collective bargaining agreement (which, of course, the FOP does not) the district court nonetheless failed to appreciate the consequences of its decision to vacate the arbitrator's March 24, 2014 Opinion and Award on such grounds—namely, that it tacitly if not explicitly endorses Amtrak's calculated effort to perform an end-run around the due-process protections that unmistakably govern APD OIA investigations and instead rely solely upon the poisoned fruits of Amtrak OIG investigations in meting out discipline to its employees.

As a preliminary matter, the district court incorrectly held in its December 30, 2015 Memorandum Opinion that since the FOP "could have raised [the foregoing] argument in its Cross-Motion and failed to do so, the argument shall not be considered" on the FOP's motion for reconsideration.  (District Court Dkt. No. 36, p.12).  Though the FOP admittedly did not, until its motion for reconsideration, use the phrase "poisoned fruit" as a term of art in either of its prior submissions to the district court, the implication of the FOP's argument concerning the interplay between Amtrak's OIG and Amtrak's internal affairs bureau was nonetheless readily apparent: Amtrak's internal affairs bureau cannot simply re-package Amtrak OIG's investigative findings and then adopt them as its own, especially if Amtrak plans to rely solely upon those findings to impose discipline on one of its

police officers without first affording that officer the negotiated protections set forth at Rule 50 of the parties' collective bargaining agreement. And it certainly cannot do so *after* already clearing that same officer of wrongdoing following its *own* investigation.

The aftereffect of the district court's decision to ignore the FOP's argument is troublesome: a systemic practice of outsourcing all future APD internal-affairs investigations to Amtrak's inspector general—or, at the very least, those select investigations for which Amtrak has a vested, tactical interest in shirking its contractual obligation to afford due-process protections prior to their commencement. The obvious cannot be overstated: The statutory duty of Amtrak's OIG is merely to *report* its investigative findings to Amtrak's chief executive officer; it is not to supplant the dedicated investigative functions of Amtrak's internal affairs bureau or to serve as the APD OIA's investigative (and prosecutorial) stalking horse.

Given that Amtrak's FOP members are perhaps the only law enforcement officers in the entire United States that have no *statutory* Weingarten protections, one is left to wonder in the wake of the district court's decision what incentive the APD OIA has to ever again conduct an internal affairs investigation of its own, especially when Amtrak's OIG can operate (at least under the district court's rubric) with no regard whatsoever for the due-process rights of Amtrak employees

29

conferred by both the parties' collective bargaining agreement and the statutory investigative restrictions imposed by Congress through the CIGIE and the QSI. Such manifest injustice cannot be countenanced.

## CONCLUSION

For the reasons set forth herein, the FOP respectfully requests that the district court's decision be reversed and the case remanded with instructions to the district court to: (1) vacate its November 2, 2015 Memorandum Decision granting summary judgment in Amtrak's favor; and (2) award summary judgment to the FOP by way of confirmation of Arbitrator Joan Parker's March 24, 2014 Opinion and Award.

DATED:  June 19, 2016                    Respectfully Submitted,

                                         /s/ Thomas A. Cushane
                                         Thomas A. Cushane, Esquire
                                         THE CUSHANE LAW FIRM, LLC
                                         1028 East Landis Avenue
                                         Vineland, New Jersey 08360
                                         Tel: (856) 794-2050
                                         Fax: (856) 794-2080
                                         t.cushane@cushanelawfirm.com

                                         *Counsel for Defendant-Appellant*
                                         Fraternal Order of Police,
                                         Lodge 189 Labor Committee

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32(e)(1), I hereby certify that Appellant's brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as the brief contains 7074 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

I further certify that Appellant's brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as the brief has been prepared in Times New Roman 14-point font using Microsoft Word for Mac 2011.

/s/ Thomas A. Cushane
Thomas A. Cushane, Esquire

*Counsel for Defendant-Appellant*
Fraternal Order of Police,
Lodge 189 Labor Committee

## CERTIFICATE OF SERVICE

I hereby certify that in accordance with this Court's May 13, 2016 Order, I electronically filed on June 19, 2016 a copy of Appellant's Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system.

I further certify that electronic service of the same was accomplished on the same date on all other parties to this appeal using the CM/ECF system, including upon the following:

Thomas E. Reinert, Jr., Esquire
Matthew J. Sharbaugh, Esquire
MORGAN, LEWIS, & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-3000
(202) 739-3001
treinert@morganlewis.com
msharbaugh@morganlewis.com

Respectfully Submitted,

/s/ Thomas A. Cushane
Thomas A. Cushane, Esquire
THE CUSHANE LAW FIRM, LLC
1028 East Landis Avenue
Vineland, New Jersey 08360
Tel: (856) 794-2050
t.cushane@cushanelawfirm.com

*Counsel for Defendant-Appellant*
Fraternal Order of Police,
Lodge 189 Labor Committee

# <u>STATUTORY ADDENDUM</u>

45 <u>U.S.C.</u> § 151(a) ......................................................................... ADD-1

45 <u>U.S.C.</u> § 153 First (q) ................................................................ ADD-4

5 <u>U.S.C.</u> App. 3 § 8G(a)(1)(B) ..................................................... ADD-6

5 <u>U.S.C.</u> App. 3 § 8G(a)(2) ........................................................... ADD-6

5 <u>U.S.C.</u> App. 3 § 11(a)(2)(B) ...................................................... ADD-7

5 <u>U.S.C.</u> App. 3 § 11(b)(1)(A) ...................................................... ADD-7

5 <u>U.S.C.</u> App. 3 § 11(d)(7)(A) ...................................................... ADD-9

and 351 of this title), the Social Security Act, approved August 14, 1935 (section 301 et seq. of Title 42), and all amendments thereto, shall operate as if each amendment herein contained had been enacted as a part of the law it amends, at the time of the original enactment of such law.

"(b) No person (as defined in the Carriers Taxing Act of 1937 [section 261 et seq. of this title]) shall be entitled, by reason of the provisions of this Act, to a refund of, or relief from liability for, any income or excise taxes paid or accrued, pursuant to the provisions of the Carriers Taxing Act of 1937 or subchapter B of chapter 9 of the Internal Revenue Code [section 1500 et seq. of former Title 26, Internal Revenue Code of 1939], prior to the date of the enactment of this Act [Aug. 13, 1940] by reason of employment in the service of any carrier by railroad subject to part I of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.], but any individual who has been employed in such service of any carrier by railroad subject to part I of the Interstate Commerce Act as is excluded by the amendments made by this Act from coverage under the Carriers Taxing Act of 1937 and subchapter B of chapter 9 of the Internal Revenue Code, and who has paid income taxes under the provisions of such Act or subchapter, and any carrier by railroad subject to part I of the Interstate Commerce Act which has paid excise taxes under the provisions of the Carriers Taxing Act of 1937 or subchapter B of chapter 9 of the Internal Revenue Code, may, upon making proper application therefor to the Bureau of Internal Revenue [now Internal Revenue Service], have the amount of taxes so paid applied in reduction of such tax liability with respect to employment, as may, by reason of the amendments made by this Act, accrue against them under the provisions of title VIII of the Social Security Act [section 1001 et seq. of Title 42] or the Federal Insurance Contributions Act (subchapter A of chapter 9 of the Internal Revenue Code) [section 1400 et seq. of former Title 26].

"(c) Nothing contained in this Act shall operate (1) to affect any annuity, pension, or death benefit granted under the Railroad Retirement Act of 1935 [section 215 et seq. of this title] or the Railroad Retirement Act of 1937 [section 228a et seq. of this title], prior to the date of enactment of this Act [Aug. 13, 1940], or (2) to include any of the services on the basis of which any such annuity or pension was granted, as employment within the meaning of section 210(b) of the Social Security Act or section 209(b) of such Act, as amended [sections 410(b) and 409(b), respectively, of Title 42]. In any case in which a death benefit alone has been granted, the amount of such death benefit attributable to services, coverage of which is affected by this Act, shall be deemed to have been paid to the deceased under section 204 of the Social Security Act [section 404 of Title 42] in effect prior to January 1, 1940, and deductions shall be made from any insurance benefit or benefits payable under the Social Security Act, as amended [section 301 et seq. of Title 42], with respect to wages paid to an individual for such services until such deductions total the amount of such death benefit attributable to such services.

"(d) Nothing contained in this Act shall operate to affect the benefit rights of any individual under the Railroad Unemployment Insurance Act [section 351 et seq. of this title] for any day of unemployment (as defined in section 1(k) of such Act [section 351(k) of this title]) occurring prior to the date of enactment of this Act. [Aug. 13, 1940]

"SEC. 5. Any application for payment filed with the Railroad Retirement Board prior to, or within sixty days after, the enactment of this Act shall, under such regulations as the Federal Security Administrator may prescribe, be deemed to be an application filed with the Federal Security Administrator by such individual or by any person claiming any payment with respect to the wages of such individual, under any provision of section 202 of the Social Security Act, as amended [section 402 of Title 42].

"SEC. 6. Nothing contained in this Act, nor the action of Congress in adopting it, shall be taken or considered as affecting the question of what carriers, companies, or individuals, other than those in this Act specifically provided for, are included in or excluded from the provisions of the various laws to which this Act is an amendment.

"SEC. 7. (a) Notwithstanding the provisions of section 1605(b) of the Internal Revenue Code [section 1605(b) of former Title 26, Internal Revenue Code of 1939], no interest shall, during the period February 1, 1940, to the eighty-ninth day after the date of enactment of this Act [Aug. 13, 1940], inclusive, accrue by reason of delinquency in the payment of the tax imposed by section 1600 with respect to services affected by this Act performed during the period July 1, 1939, to December 31, 1939, inclusive, with respect to which services amounts have been paid as contributions under the Railroad Unemployment Insurance Act [section 351 et seq. of this title] prior to the date of enactment of this Act.

"(b) Notwithstanding the provisions of section 1601(a)(3) of the Internal Revenue Code [section 1601(a)(3) of former Title 26, Internal Revenue Code of 1939], the credit allowable under section 1601(a) against the tax imposed by section 1600 for the calendar year 1939 shall not be disallowed or reduced by reason of the payment into a State unemployment fund after January 31, 1940, of contributions with respect to services affected by this Act performed during the period July 1, 1939, to December 31, 1939, inclusive, with respect to which services amounts have been paid as contributions under the Railroad Unemployment Insurance Act [section 351 et seq. of this title] prior to the date of enactment of this Act [Aug. 13, 1940]: *Provided*, That this subsection shall be applicable only if the contributions with respect to such services are paid into the State unemployment fund before the ninetieth day after the date of enactment of this Act."

## § 151a. General purposes

The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

(May 20, 1926, ch. 347, § 2, 44 Stat. 577; June 21, 1934, ch. 691, § 2, 48 Stat. 1186.)

#### Codification

Section is comprised of the first sentence of section 2 of act May 20, 1926. The remainder of section 2 of act May 20, 1926, is classified to section 152 of this title.

#### Amendments

1934—Act June 21, 1934, reenacted provisions comprising this section without change.

## § 152. General duties

### First. Duty of carriers and employees to settle disputes

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working con-

USCA Case #16-7004    Document #1620182    Filed: 06/19/2016    Page 44 of 51

his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further*, That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

(d) Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended.

(May 20, 1926, ch. 347, §2, 44 Stat. 577; June 21, 1934, ch. 691, §2, 48 Stat. 1186; June 25, 1948, ch. 646, §1, 62 Stat. 909; Jan. 10, 1951, ch. 1220, 64 Stat. 1238.)

### References in Text

The effective date of this chapter, referred to in par. Fifth, probably means May 20, 1926, the date of approval of act May 20, 1926, ch. 347, 44 Stat. 577.

### Codification

Section is comprised of pars. designated First to Eleventh of section 2 of act May 20, 1926. The remainder of section 2 of act May 20, 1926, is classified to section 151a of this title.

### Amendments

1951—Act Jan. 10, 1951, added par. Eleventh.

1934—Act June 21, 1934, substituted "by the carrier or carriers" for "by the carriers" in par. Second, generally amended pars. Third, Fourth and Fifth, and added pars. Sixth to Tenth.

### Change of Name

Act June 25, 1948, eff. Sept. 1, 1948, substituted "United States attorney" for "district attorney of the United States". See section 541 of Title 28, Judiciary and Judicial Procedure, and Historical and Revision Notes thereunder.

### § 153. National Railroad Adjustment Board

#### First. Establishment; composition; powers and duties; divisions; hearings and awards; judicial review

There is established a Board, to be known as the "National Railroad Adjustment Board", the members of which shall be selected within thirty days after June 21, 1934, and it is provided—

(a) That the said Adjustment Board shall consist of thirty-four members, seventeen of whom shall be selected by the carriers and seventeen by such labor organizations of the employees, national in scope, as have been or may be organized in accordance with the provisions of sections 151a and 152 of this title.

(b) The carriers, acting each through its board of directors or its receiver or receivers, trustee or trustees, or through an officer or officers designated for that purpose by such board, trustee or trustees, or receiver or receivers, shall prescribe the rules under which its representatives shall be selected and shall select the representatives of the carriers on the Adjustment Board and designate the division on which each such representative shall serve, but no carrier or system of carriers shall have more than one voting representative on any division of the Board.

(c) Except as provided in the second paragraph of subsection (h) of this section, the national

labor organizations, as defined in paragraph (a) of this section, acting each through the chief executive or other medium designated by the organization or association thereof, shall prescribe the rules under which the labor members of the Adjustment Board shall be selected and shall select such members and designate the division on which each member shall serve; but no labor organization shall have more than one voting representative on any division of the Board.

(d) In case of a permanent or temporary vacancy on the Adjustment Board, the vacancy shall be filled by selection in the same manner as in the original selection.

(e) If either the carriers or the labor organizations of the employees fail to select and designate representatives to the Adjustment Board, as provided in paragraphs (b) and (c) of this section, respectively, within sixty days after June 21, 1934, in case of any original appointment to office of a member of the Adjustment Board, or in case of a vacancy in any such office within thirty days after such vacancy occurs, the Mediation Board shall thereupon directly make the appointment and shall select an individual associated in interest with the carriers or the group of labor organizations of employees, whichever he is to represent.

(f) In the event a dispute arises as to the right of any national labor organization to participate as per paragraph (c) of this section in the selection and designation of the labor members of the Adjustment Board, the Secretary of Labor shall investigate the claim of such labor organization to participate, and if such claim in the judgment of the Secretary of Labor has merit, the Secretary shall notify the Mediation Board accordingly, and within ten days after receipt of such advice the Mediation Board shall request those national labor organizations duly qualified as per paragraph (c) of this section to participate in the selection and designation of the labor members of the Adjustment Board to select a representative. Such representative, together with a representative likewise designated by the claimant, and a third or neutral party designated by the Mediation Board, constituting a board of three, shall within thirty days after the appointment of the neutral member, investigate the claims of the labor organization desiring participation and decide whether or not it was organized in accordance with sections 151a and 152 of this title and is otherwise properly qualified to participate in the selection of the labor members of the Adjustment Board, and the findings of such boards of three shall be final and binding.

(g) Each member of the Adjustment Board shall be compensated by the party or parties he is to represent. Each third or neutral party selected under the provisions of paragraph (f) of this section shall receive from the Mediation Board such compensation as the Mediation Board may fix, together with his necessary traveling expenses and expenses actually incurred for subsistence, or per diem allowance in lieu thereof, subject to the provisions of law applicable thereto, while serving as such third or neutral party.

(h) The said Adjustment Board shall be composed of four divisions, whose proceedings shall

be independent of one another, and the said divisions as well as the number of their members shall be as follows:

First division: To have jurisdiction over disputes involving train- and yard-service employees of carriers; that is, engineers, firemen, hostlers, and outside hostler helpers, conductors, trainmen, and yard-service employees. This division shall consist of eight members, four of whom shall be selected and designated by the carriers and four of whom shall be selected and designated by the labor organizations, national in scope and organized in accordance with sections 151a and 152 of this title and which represent employees in engine, train, yard, or hostling service: *Provided, however,* That each labor organization shall select and designate two members on the First Division and that no labor organization shall have more than one vote in any proceedings of the First Division or in the adoption of any award with respect to any dispute submitted to the First Division: *Provided further, however,* That the carrier members of the First Division shall cast no more than two votes in any proceedings of the division or in the adoption of any award with respect to any dispute submitted to the First Division.

Second division: To have jurisdiction over disputes involving machinists, boilermakers, blacksmiths, sheet-metal workers, electrical workers, carmen, the helpers and apprentices of all the foregoing, coach cleaners, power-house employees, and railroad-shop laborers. This division shall consist of ten members, five of whom shall be selected by the carriers and five by the national labor organizations of the employees.

Third division: To have jurisdiction over disputes involving station, tower, and telegraph employees, train dispatchers, maintenance-of-way men, clerical employees, freight handlers, express, station, and store employees, signal men, sleeping-car conductors, sleeping-car porters, and maids and dining-car employees. This division shall consist of ten members, five of whom shall be selected by the carriers and five by the national labor organizations of employees.

Fourth division: To have jurisdiction over disputes involving employees of carriers directly or indirectly engaged in transportation of passengers or property by water, and all other employees of carriers over which jurisdiction is not given to the first, second, and third divisions. This division shall consist of six members, three of whom shall be selected by the carriers and three by the national labor organizations of the employees.

(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

(j) Parties may be heard either in person, by counsel, or by other representatives, as they may respectively elect, and the several divisions of the Adjustment Board shall give due notice of all hearings to the employee or employees and the carrier or carriers involved in any disputes submitted to them.

(k) Any division of the Adjustment Board shall have authority to empower two or more of its members to conduct hearings and make findings upon disputes, when properly submitted, at any place designated by the division: *Provided, however,* That except as provided in paragraph (h) of this section, final awards as to any such dispute must be made by the entire division as hereinafter provided.

(l) Upon failure of any division to agree upon an award because of a deadlock or inability to secure a majority vote of the division members, as provided in paragraph (n) of this section, then such division shall forthwith agree upon and select a neutral person, to be known as "referee", to sit with the division as a member thereof, and make an award. Should the division fail to agree upon and select a referee within ten days of the date of the deadlock or inability to secure a majority vote, then the division, or any member thereof, or the parties or either party to the dispute may certify that fact to the Mediation Board, which Board shall, within ten days from the date of receiving such certificate, select and name the referee to sit with the division as a member thereof and make an award. The Mediation Board shall be bound by the same provisions in the appointment of these neutral referees as are provided elsewhere in this chapter for the appointment of arbitrators and shall fix and pay the compensation of such referees.

(m) The awards of the several divisions of the Adjustment Board shall be stated in writing. A copy of the awards shall be furnished to the respective parties to the controversy, and the awards shall be final and binding upon both parties to the dispute. In case a dispute arises involving an interpretation of the award, the division of the board upon request of either party shall interpret the award in the light of the dispute.

(n) A majority vote of all members of the division of the Adjustment Board eligible to vote shall be competent to make an award with respect to any dispute submitted to it.

(o) In case of an award by any division of the Adjustment Board in favor of petitioner, the division of the Board shall make an order, directed to the carrier, to make the award effective and, if the award includes a requirement for the payment of money, to pay to the employee the sum to which he is entitled under the award on or before a day named. In the event any division determines that an award favorable to the petitioner should not be made in any dispute referred to it, the division shall make an order to the petitioner stating such determination.

(p) If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of

ADD-3

USCA Case #16-7004    Document #1620182    Filed: 06/19/2016    Page 46 of 51

the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be conclusive on the parties, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board: *Provided, however*, That such order may not be set aside except for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

(q) If any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee or group of employees or carrier may file in any United States district court in which a petition under paragraph (p) could be filed, a petition for review of the division's order. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Adjustment Board. The Adjustment Board shall file in the court the record of the proceedings on which it based its action. The court shall have jurisdiction to affirm the order of the division, or to set it aside, in whole or in part, or it may remand the proceedings to the division for such further action as it may direct. On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order. The judgment of the court shall be subject to review as provided in sections 1291 and 1254 of title 28.

(r) All actions at law based upon the provisions of this section shall be begun within two years from the time the cause of action accrues under the award of the division of the Adjustment Board, and not after.

(s) The several divisions of the Adjustment Board shall maintain headquarters in Chicago, Illinois, meet regularly, and continue in session so long as there is pending before the division any matter within its jurisdiction which has been submitted for its consideration and which has not been disposed of.

(t) Whenever practicable, the several divisions or subdivisions of the Adjustment Board shall be supplied with suitable quarters in any Federal building located at its place of meeting.

(u) The Adjustment Board may, subject to the approval of the Mediation Board, employ and fix the compensations of such assistants as it deems necessary in carrying on its proceedings. The compensation of such employees shall be paid by the Mediation Board.

(v) The Adjustment Board shall meet within forty days after June 21, 1934, and adopt such rules as it deems necessary to control proceedings before the respective divisions and not in conflict with the provisions of this section. Immediately following the meeting of the entire Board and the adoption of such rules, the respective divisions shall meet and organize by the selection of a chairman, a vice chairman, and a secretary. Thereafter each division shall annually designate one of its members to act as chairman and one of its members to act as vice chairman: *Provided, however*, That the chairmanship and vice-chairmanship of any division shall alternate as between the groups, so that both the chairmanship and vice-chairmanship shall be held alternately by a representative of the carriers and a representative of the employees. In case of a vacancy, such vacancy shall be filled for the unexpired term by the selection of a successor from the same group.

(w) Each division of the Adjustment Board shall annually prepare and submit a report of its activities to the Mediation Board, and the substance of such report shall be included in the annual report of the Mediation Board to the Congress of the United States. The reports of each division of the Adjustment Board and the annual report of the Mediation Board shall state in detail all cases heard, all actions taken, the names, salaries, and duties of all agencies, employees, and officers receiving compensation from the United States under the authority of this chapter, and an account of all moneys appropriated by Congress pursuant to the authority conferred by this chapter and disbursed by such agencies, employees, and officers.

(x) Any division of the Adjustment Board shall have authority, in its discretion, to establish regional adjustment boards to act in its place and stead for such limited period as such division may determine to be necessary. Carrier members of such regional boards shall be designated in keeping with rules devised for this purpose by the carrier members of the Adjustment Board and the labor members shall be designated in keeping with rules devised for this purpose by the labor members of the Adjustment Board. Any such regional board shall, during the time for which it is appointed, have the same authority to conduct hearings, make findings upon disputes and adopt the same procedure as the division of the Adjustment Board appointing it, and its decisions shall be enforceable to the same extent and under the same processes. A neutral person, as referee, shall be appointed for service in connection with any such regional adjustment board in the same circumstances and man-

ner as provided in paragraph (*l*) of this section, with respect to a division of the Adjustment Board.

**Second. System, group, or regional boards: establishment by voluntary agreement; special adjustment boards: establishment, composition, designation of representatives by Mediation Board, neutral member, compensation, quorum, finality and enforcement of awards**

Nothing in this section shall be construed to prevent any individual carrier, system, or group of carriers and any class or classes of its or their employees, all acting through their representatives, selected in accordance with the provisions of this chapter, from mutually agreeing to the establishment of system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes of the character specified in this section. In the event that either party to such a system, group, or regional board of adjustment is dissatisfied with such arrangement, it may upon ninety days' notice to the other party elect to come under the jurisdiction of the Adjustment Board.

If written request is made upon any individual carrier by the representative of any craft or class of employees of such carrier for the establishment of a special board of adjustment to resolve disputes otherwise referable to the Adjustment Board, or any dispute which has been pending before the Adjustment Board for twelve months from the date the dispute (claim) is received by the Board, or if any carrier makes such a request upon any such representative, the carrier or the representative upon whom such request is made shall join in an agreement establishing such a board within thirty days from the date such request is made. The cases which may be considered by such board shall be defined in the agreement establishing it. Such board shall consist of one person designated by the carrier and one person designated by the representative of the employees. If such carrier or such representative fails to agree upon the establishment of such a board as provided herein, or to exercise its rights to designate a member of the board, the carrier or representative making the request for the establishment of the special board may request the Mediation Board to designate a member of the special board on behalf of the carrier or representative upon whom such request was made. Upon receipt of a request for such designation the Mediation Board shall promptly make such designation and shall select an individual associated in interest with the carrier or representative he is to represent, who, with the member appointed by the carrier or representative requesting the establishment of the special board, shall constitute the board. Each member of the board shall be compensated by the party he is to represent. The members of the board so designated shall determine all matters not previously agreed upon by the carrier and the representative of the employees with respect to the establishment and jurisdiction of the board. If they are unable to agree such matters shall be determined by a neutral member of the board selected or appointed and compensated in the same manner as is hereinafter provided with respect to situations where the members of the board are unable to agree upon an award. Such neutral member shall cease to be a member of the board when he has determined such matters. If with respect to any dispute or group of disputes the members of the board designated by the carrier and the representative are unable to agree upon an award disposing of the dispute or group of disputes they shall by mutual agreement select a neutral person to be a member of the board for the consideration and disposition of such dispute or group of disputes. In the event the members of the board designated by the parties are unable, within ten days after their failure to agree upon an award, to agree upon the selection of such neutral person, either member of the board may request the Mediation Board to appoint such neutral person and upon receipt of such request the Mediation Board shall promptly make such appointment. The neutral person so selected or appointed shall be compensated and reimbursed for expenses by the Mediation Board. Any two members of the board shall be competent to render an award. Such awards shall be final and binding upon both parties to the dispute and if in favor of the petitioner, shall direct the other party to comply therewith on or before the day named. Compliance with such awards shall be enforcible by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the Adjustment Board.

(May 20, 1926, ch. 347, §3, 44 Stat. 578; June 21, 1934, ch. 691, §3, 48 Stat. 1189; Pub. L. 89–456, §§1, 2, June 20, 1966, 80 Stat. 208, 209; Pub. L. 91–234, §§1–6, Apr. 23, 1970, 84 Stat. 199, 200.)

AMENDMENTS

1970—Par. First, (a). Pub. L. 91–234, §1, substituted "thirty-four members, seventeen of whom shall be selected by the carriers and seventeen" for "thirty-six members, eighteen of whom shall be selected by the carriers and eighteen".

Par. First, (b). Pub. L. 91–234, §2, provided that no carrier or system of carriers have more than one voting representative on any division of the National Railroad Adjustment Board.

Par. First, (c). Pub. L. 91–234, §3, inserted "Except as provided in the second paragraph of subsection (h) of this section" before "the national labor organizations", and provided that no labor organization have more than one voting representative on any division of the National Railroad Adjustment Board.

Par. First, (h). Pub. L. 91–234, §4, decreased number of members on First division of Board from ten to eight members, with an accompanying decrease of five to four as number of members of such Board elected respectively by the carriers and by the national labor organizations satisfying the enumerated requirements, and set forth provisos which limited voting by each labor organization or carrier member in any proceedings of the division or in adoption of any award.

Par. First, (k). Pub. L. 91–234, §5, inserted "except as provided in paragraph (h) of this section" after proviso.

Par. First, (n). Pub. L. 91–234, §6, inserted "eligible to vote" after "Adjustment Board".

1966—Par. First, (m). Pub. L. 89–456, §2(a), struck out ", except insofar as they shall contain a money award" from second sentence.

Par. First, (o). Pub. L. 89–456, §2(b), inserted provision for a division to make an order to the petitioner stating that an award favorable to the petitioner should not be made in any dispute referred to it.

USCA Case #16-7004        Document #1620182        Filed: 06/19/2016        Page 48 of 51

also transmit any audit report which is described in the statement required under section 5(b)(4) to the Board of Directors. All such audit reports shall be placed on the agenda for review at the next scheduled meeting of the Board of Directors following such transmittal. The Chief Executive Officer of the Corporation shall be present at such meeting to provide any information relating to such audit reports.

(d) No later than the date on which the Inspector General of the Corporation for National and Community Service reports a problem, abuse, or deficiency under section 5(d) to the Chief Executive Officer of the Corporation, the Chief Executive Officer shall report such problem, abuse, or deficiency to the Board of Directors.

(Pub. L. 95–452, §8F, formerly §8E, as added Pub. L. 103–82, title II, §202(g)(1), Sept. 21, 1993, 107 Stat. 889; renumbered §8F, Pub. L. 103–204, §23(a)(3), Dec. 17, 1993, 107 Stat. 2408; amended Pub. L. 111–13, title IV, §4101, Apr. 21, 2009, 123 Stat. 1597.)

CODIFICATION

Pub. L. 103–204, §23(a)(4), Dec. 17, 1993, 107 Stat. 2408, which directed the amendment of section 8F(a)(2) by striking out "the Federal Deposit Insurance Corporation,", could not be executed to this section because the quoted language does not appear. However, the amendment was executed to section 8G(a)(2) of the Inspector General Act of 1978 relating to requirements for Federal entities and designated Federal entities, to reflect the probable intent of Congress and the successive renumbering of that section as section 8F by Pub. L. 103–82 and as section 8G by Pub. L. 103–204.

PRIOR PROVISIONS

A prior section 8F of the Inspector General Act of 1978, relating to requirements for Federal entities and designated Federal entities, was renumbered section 8G by Pub. L. 103–204.

Another prior section 8F of the Inspector General Act of 1978, relating to rule of construction of special provisions, was renumbered section 8J.

AMENDMENTS

2009—Subsec. (a)(1). Pub. L. 111–13 substituted "National and Community Service Act of 1990" for "National and Community Service Trust Act of 1993".

EFFECTIVE DATE OF 2009 AMENDMENT

Amendment by Pub. L. 111–13 effective Oct. 1, 2009, see section 6101(a) of Pub. L. 111–13, set out as a note under section 4950 of Title 42, The Public Health and Welfare.

EFFECTIVE DATE

Section effective Oct. 1, 1993, see section 202(i) of Pub. L. 103–82, set out as a note under section 12651 of Title 42, The Public Health and Welfare.

**§8G. Requirements for Federal entities and designated Federal entities**

(a) Notwithstanding section 12 of this Act, as used in this section—

(1) the term "Federal entity" means any Government corporation (within the meaning of section 103(1) of title 5, United States Code), any Government controlled corporation (within the meaning of section 103(2) of such title), or any other entity in the Executive branch of the Government, or any independent regulatory agency, but does not include—

(A) an establishment (as defined under section 12(2) of this Act) or part of an establishment;

(B) a designated Federal entity (as defined under paragraph (2) of this subsection) or part of a designated Federal entity;

(C) the Executive Office of the President;

(D) the Central Intelligence Agency;

(E) the Government Accountability Office; or

(F) any entity in the judicial or legislative branches of the Government, including the Administrative Office of the United States Courts and the Architect of the Capitol and any activities under the direction of the Architect of the Capitol;

(2) the term "designated Federal entity" means Amtrak, the Appalachian Regional Commission, the Board of Governors of the Federal Reserve System, the Board for International Broadcasting, the Commodity Futures Trading Commission, the Consumer Product Safety Commission, the Corporation for Public Broadcasting, the Denali Commission, the Equal Employment Opportunity Commission, the Farm Credit Administration, the Federal Communications Commission, the Federal Election Commission, the Election Assistance Commission, the Federal Housing Finance Board, the Federal Labor Relations Authority, the Federal Maritime Commission, the Federal Trade Commission, the Legal Services Corporation, the National Archives and Records Administration, the National Credit Union Administration, the National Endowment for the Arts, the National Endowment for the Humanities, the National Labor Relations Board, the National Science Foundation, the Panama Canal Commission, the Peace Corps, the Pension Benefit Guaranty Corporation, the Securities and Exchange Commission, the Smithsonian Institution, the United States International Trade Commission, the Postal Regulatory Commission, and the United States Postal Service;

(3) the term "head of the Federal entity" means any person or persons designated by statute as the head of a Federal entity, and if no such designation exists, the chief policymaking officer or board of a Federal entity as identified in the list published pursuant to subsection (h)(1) of this section;

(4) the term "head of the designated Federal entity" means any person or persons designated by statute as the head of a designated Federal entity and if no such designation exists, the chief policymaking officer or board of a designated Federal entity as identified in the list published pursuant to subsection (h)(1) of this section, except that—

(A) with respect to the National Science Foundation, such term means the National Science Board; and

(B) with respect to the United States Postal Service, such term means the Governors (within the meaning of section 102(3) of title 39, United States Code);

(5) the term "Office of Inspector General" means an Office of Inspector General of a designated Federal entity; and

fice of the Treasury Inspector General for Tax Administration.''

CONTINUATION OF SERVICE OF CERTAIN INSPECTORS GENERAL

Section 102(e)(4) of Pub. L. 100–504 provided that: ''Any individual who, on the date of enactment of this Act [Oct. 18, 1988], is serving as the Inspector General of the Department of Energy, the Department of Health and Human Services, or the Railroad Retirement Board, shall continue to serve in such position until such individual dies, resigns, or is removed from office in accordance with section 3(b) of the Inspector General Act of 1978 [section 3(b) of Pub. L. 95–452, set out in this Appendix].''

TRANSFER OF AUDIT PERSONNEL TO INSPECTOR GENERAL, DEPARTMENT OF DEFENSE

Section 1117(e) of Pub. L. 97–252 provided that: ''In addition to the positions transferred to the Office of the Inspector General of the Department of Defense, pursuant to the amendments made by subsection (a) of this section [amending sections 2(1), 9(a)(1), and 11(1) of this Act], the Secretary of Defense shall transfer to the Office of Inspector General of the Department of Defense not less than one hundred additional audit positions. The Inspector General of the Department of Defense shall fill such positions with persons trained to perform contract audits.''

## § 10. Omitted

CODIFICATION

Section, Pub. L. 95–452, § 10, Oct. 12, 1978, 92 Stat. 1108, amended sections 5315 and 5316 of Title 5, Government Organization and Employees, and section 3522 of Title 42, The Public Health and Welfare, which amendments have been executed to text.

## § 11. Establishment of the Council of the Inspectors General on Integrity and Efficiency

(a) ESTABLISHMENT AND MISSION.—

(1) ESTABLISHMENT.—There is established as an independent entity within the executive branch the Council of the Inspectors General on Integrity and Efficiency (in this section referred to as the ''Council'').

(2) MISSION.—The mission of the Council shall be to—

(A) address integrity, economy, and effectiveness issues that transcend individual Government agencies; and

(B) increase the professionalism and effectiveness of personnel by developing policies, standards, and approaches to aid in the establishment of a well-trained and highly skilled workforce in the offices of the Inspectors General.

(b) MEMBERSHIP.—

(1) IN GENERAL.—The Council shall consist of the following members:

(A) All Inspectors General whose offices are established under—

(i) section 2; or
(ii) section 8G.

(B) The Inspectors General of the Office of the Director of National Intelligence and the Central Intelligence Agency.

(C) The Controller of the Office of Federal Financial Management.

(D) A senior level official of the Federal Bureau of Investigation designated by the Director of the Federal Bureau of Investigation.

(E) The Director of the Office of Government Ethics.

(F) The Special Counsel of the Office of Special Counsel.

(G) The Deputy Director of the Office of Personnel Management.

(H) The Deputy Director for Management of the Office of Management and Budget.

(I) The Inspectors General of the Library of Congress, Capitol Police, Government Printing Office, Government Accountability Office, and the Architect of the Capitol.

(2) CHAIRPERSON AND EXECUTIVE CHAIRPERSON.—

(A) EXECUTIVE CHAIRPERSON.—The Deputy Director for Management of the Office of Management and Budget shall be the Executive Chairperson of the Council.

(B) CHAIRPERSON.—The Council shall elect 1 of the Inspectors General referred to in paragraph (1)(A) or (B) to act as Chairperson of the Council. The term of office of the Chairperson shall be 2 years.

(3) FUNCTIONS OF CHAIRPERSON AND EXECUTIVE CHAIRPERSON.—

(A) EXECUTIVE CHAIRPERSON.—The Executive Chairperson shall—

(i) preside over meetings of the Council;

(ii) provide to the heads of agencies and entities represented on the Council summary reports of the activities of the Council; and

(iii) provide to the Council such information relating to the agencies and entities represented on the Council as assists the Council in performing its functions.

(B) CHAIRPERSON.—The Chairperson shall—

(i) convene meetings of the Council—

(I) at least 6 times each year;

(II) monthly to the extent possible; and

(III) more frequently at the discretion of the Chairperson;

(ii) carry out the functions and duties of the Council under subsection (c);

(iii) appoint a Vice Chairperson to assist in carrying out the functions of the Council and act in the absence of the Chairperson, from a category of Inspectors General described in subparagraph (A)(i), (A)(ii), or (B) of paragraph (1), other than the category from which the Chairperson was elected;

(iv) make such payments from funds otherwise available to the Council as may be necessary to carry out the functions of the Council;

(v) select, appoint, and employ personnel as needed to carry out the functions of the Council subject to the provisions of title 5, United States Code, governing appointments in the competitive service, and the provisions of chapter 51 and subchapter III of chapter 53 of such title, relating to classification and General Schedule pay rates;

(vi) to the extent and in such amounts as may be provided in advance by appropriations Acts, made available from the revolving fund established under subsection (c)(3)(B), or as otherwise provided by law,

ADD-7

USCA Case #16-7004     Document #1620182     Filed: 06/19/2016     Page 50 of 51

enter into contracts and other arrangements with public agencies and private persons to carry out the functions and duties of the Council;

(vii) establish, in consultation with the members of the Council, such committees as determined by the Chairperson to be necessary and appropriate for the efficient conduct of Council functions; and

(viii) prepare and transmit a report annually on behalf of the Council to the President on the activities of the Council.

(c) FUNCTIONS AND DUTIES OF COUNCIL.—

(1) IN GENERAL.—The Council shall—

(A) continually identify, review, and discuss areas of weakness and vulnerability in Federal programs and operations with respect to fraud, waste, and abuse;

(B) develop plans for coordinated, Governmentwide activities that address these problems and promote economy and efficiency in Federal programs and operations, including interagency and interentity audit, investigation, inspection, and evaluation programs and projects to deal efficiently and effectively with those problems concerning fraud and waste that exceed the capability or jurisdiction of an individual agency or entity;

(C) develop policies that will aid in the maintenance of a corps of well-trained and highly skilled Office of Inspector General personnel;

(D) maintain an Internet website and other electronic systems for the benefit of all Inspectors General, as the Council determines are necessary or desirable;

(E) maintain 1 or more academies as the Council considers desirable for the professional training of auditors, investigators, inspectors, evaluators, and other personnel of the various offices of Inspector General;

(F) submit recommendations of individuals to the appropriate appointing authority for any appointment to an office of Inspector General described under subsection (b)(1)(A) or (B);

(G) make such reports to Congress as the Chairperson determines are necessary or appropriate; and

(H) perform other duties within the authority and jurisdiction of the Council, as appropriate.

(2) ADHERENCE AND PARTICIPATION BY MEMBERS.—To the extent permitted under law, and to the extent not inconsistent with standards established by the Comptroller General of the United States for audits of Federal establishments, organizations, programs, activities, and functions, each member of the Council, as appropriate, shall—

(A) adhere to professional standards developed by the Council; and

(B) participate in the plans, programs, and projects of the Council, except that in the case of a member described under subsection (b)(1)(I), the member shall participate only to the extent requested by the member and approved by the Executive Chairperson and Chairperson.

(3) ADDITIONAL ADMINISTRATIVE AUTHORITIES.—

(A) INTERAGENCY FUNDING.—Notwithstanding section 1532 of title 31, United States Code, or any other provision of law prohibiting the interagency funding of activities described under subclause (I), (II), or (III) of clause (i), in the performance of the responsibilities, authorities, and duties of the Council—

(i) the Executive Chairperson may authorize the use of interagency funding for—

(I) Governmentwide training of employees of the Offices of the Inspectors General;

(II) the functions of the Integrity Committee of the Council; and

(III) any other authorized purpose determined by the Council; and

(ii) upon the authorization of the Executive Chairperson, any department, agency, or entity of the executive branch which has a member on the Council shall fund or participate in the funding of such activities.

(B) REVOLVING FUND.—

(i) IN GENERAL.—The Council may—

(I) establish in the Treasury of the United States a revolving fund to be called the Inspectors General Council Fund; or

(II) enter into an arrangement with a department or agency to use an existing revolving fund.

(ii) AMOUNTS IN REVOLVING FUND.—

(I) IN GENERAL.—Amounts transferred to the Council under this subsection shall be deposited in the revolving fund described under clause (i)(I) or (II).

(II) TRAINING.—Any remaining unexpended balances appropriated for or otherwise available to the Inspectors General Criminal Investigator Academy and the Inspectors General Auditor Training Institute shall be transferred to the revolving fund described under clause (i)(I) or (II).

(iii) USE OF REVOLVING FUND.—

(I) IN GENERAL.—Except as provided under subclause (II), amounts in the revolving fund described under clause (i)(I) or (II) may be used to carry out the functions and duties of the Council under this subsection.

(II) TRAINING.—Amounts transferred into the revolving fund described under clause (i)(I) or (II) may be used for the purpose of maintaining any training academy as determined by the Council.

(iv) AVAILABILITY OF FUNDS.—Amounts in the revolving fund described under clause (i)(I) or (II) shall remain available to the Council without fiscal year limitation.

(C) SUPERSEDING PROVISIONS.—No provision of law enacted after the date of enactment of this subsection shall be construed to limit or supersede any authority under subparagraph (A) or (B), unless such provision makes spe-

cific reference to the authority in that paragraph.[1]

(4) EXISTING AUTHORITIES AND RESPONSIBILITIES.—The establishment and operation of the Council shall not affect—

(a) the role of the Department of Justice in law enforcement and litigation;

(b) the authority or responsibilities of any Government agency or entity; and

(c) the authority or responsibilities of individual members of the Council.

(d) INTEGRITY COMMITTEE.—

(1) ESTABLISHMENT.—The Council shall have an Integrity Committee, which shall receive, review, and refer for investigation allegations of wrongdoing that are made against Inspectors General and staff members of the various Offices of Inspector General described under paragraph (4)(C).

(2) MEMBERSHIP.—The Integrity Committee shall consist of the following members:

(A) The official of the Federal Bureau of Investigation serving on the Council, who shall serve as Chairperson of the Integrity Committee, and maintain the records of the Committee.

(B) Four Inspectors General described in subparagraph (A) or (B) of subsection (b)(1) appointed by the Chairperson of the Council, representing both establishments and designated Federal entities (as that term is defined in section 8G(a)).

(C) The Special Counsel of the Office of Special Counsel.

(D) The Director of the Office of Government Ethics.

(3) LEGAL ADVISOR.—The Chief of the Public Integrity Section of the Criminal Division of the Department of Justice, or his designee, shall serve as a legal advisor to the Integrity Committee.

(4) REFERRAL OF ALLEGATIONS.—

(A) REQUIREMENT.—An Inspector General shall refer to the Integrity Committee any allegation of wrongdoing against a staff member of the office of that Inspector General, if—

(i) review of the substance of the allegation cannot be assigned to an agency of the executive branch with appropriate jurisdiction over the matter; and

(ii) the Inspector General determines that—

(I) an objective internal investigation of the allegation is not feasible; or

(II) an internal investigation of the allegation may appear not to be objective.

(B) DEFINITION.—In this paragraph the term "staff member" means any employee of an Office of Inspector General who—

(i) reports directly to an Inspector General; or

(ii) is designated by an Inspector General under subparagraph (C).

(C) DESIGNATION OF STAFF MEMBERS.—Each Inspector General shall annually submit to the Chairperson of the Integrity Committee

---

[1] So in original. Probably should be "subparagraph."

a designation of positions whose holders are staff members for purposes of subparagraph (B).

(5) REVIEW OF ALLEGATIONS.—The Integrity Committee shall—

(A) review all allegations of wrongdoing the Integrity Committee receives against an Inspector General, or against a staff member of an Office of Inspector General described under paragraph (4)(C);

(B) refer any allegation of wrongdoing to the agency of the executive branch with appropriate jurisdiction over the matter; and

(C) refer to the Chairperson of the Integrity Committee any allegation of wrongdoing determined by the Integrity Committee under subparagraph (A) to be potentially meritorious that cannot be referred to an agency under subparagraph (B).

(6) AUTHORITY TO INVESTIGATE ALLEGATIONS.—

(A) REQUIREMENT.—The Chairperson of the Integrity Committee shall cause a thorough and timely investigation of each allegation referred under paragraph (5)(C) to be conducted in accordance with this paragraph.

(B) RESOURCES.—At the request of the Chairperson of the Integrity Committee, the head of each agency or entity represented on the Council—

(i) may provide resources necessary to the Integrity Committee; and

(ii) may detail employees from that agency or entity to the Integrity Committee, subject to the control and direction of the Chairperson, to conduct an investigation under this subsection.

(7) PROCEDURES FOR INVESTIGATIONS.—

(A) STANDARDS APPLICABLE.—Investigations initiated under this subsection shall be conducted in accordance with the most current Quality Standards for Investigations issued by the Council or by its predecessors (the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency).

(B) ADDITIONAL POLICIES AND PROCEDURES.—

(i) ESTABLISHMENT.—The Integrity Committee, in conjunction with the Chairperson of the Council, shall establish additional policies and procedures necessary to ensure fairness and consistency in—

(I) determining whether to initiate an investigation;

(II) conducting investigations;

(III) reporting the results of an investigation; and

(IV) providing the person who is the subject of an investigation with an opportunity to respond to any Integrity Committee report.

(ii) SUBMISSION TO CONGRESS.—The Council shall submit a copy of the policies and procedures established under clause (i) to the congressional committees of jurisdiction.

(C) REPORTS.—

(i) POTENTIALLY MERITORIOUS ALLEGATIONS.—For allegations described under